FILED

Oct 21 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Lawrence Rufrano | ) | Case No.   3-20-mj-71490 MAG |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____May 31, 2018_____ in the county of _____San Francisco_____ in the
_____Northern_____ District of _____California_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| | Maximum Penalties: 20 years imprisonment, $250,000 fine, 3 years of supervised release, restitution, $100 mandatory special assessment |

This criminal complaint is based on these facts:

See attached Affidavit of Alan Hershkowitz

☑ Continued on the attached sheet.

Approved as to form *Christopher Vieira*
                      AUSA _____

Sworn to before me by telephone.

Date:   _____October 21, 2020_____

City and state:   _____San Francisco, California_____

/s/ Alan Hershkowitz
*Complainant's signature*

Special Agent Alan Hershkowitz
*Printed name and title*

*Judge's signature*

Magistrate Judge Sallie Kim
*Printed name and title*

Print    Save As...    Attach    Reset

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Alan Hershkowitz, a Special Agent of the Office of Inspector General for the Board of Governors of the Federal Reserve System and Consumer Financial Protection Bureau, being duly sworn, hereby declare as follows:

## INTRODUCTION

1.  I make this affidavit in support of an application under Rule 4 of the Federal Rules of Criminal Procedure for a criminal complaint for Lawrence Rufrano ("Rufrano") for wire fraud, in violation of Title 18, United States Code, Section 1343 (hereafter, the "Target Offense"), on or about May 31, 2018 in the Northern District of California.

## SOURCES OF INFORMATION AND AFFIANT BACKGROUND

2.  This affidavit is submitted for the limited purpose of securing a criminal complaint.  I have not included every fact known to me concerning this investigation.  Instead, I have set forth only the facts necessary to establish probable cause that violations of the federal law identified above have occurred.

3.  I have based my statements in this affidavit on my training and experience; personal knowledge of the facts and circumstances obtained through my participation in this investigation; information provided by other agents and law enforcement officers; information provided by reports prepared by other agents and law enforcement officers; and information provided by records and databases.  Where I refer to conversations and events, I often refer to them in substance and in relevant part rather than in their entirety or verbatim, unless otherwise noted.  This affidavit also reflects my current understanding of facts relating to this investigation, but my understanding may change in the future as the investigation proceeds.

4.  I am a Special Agent with the Office of Inspector General for the Board of Governors of the Federal Reserve System and Consumer Financial Protection Bureau ("FRB OIG") assigned to the Special Investigation Unit, and have been so employed since January 2016.  My training included the Federal Law Enforcement Training Centers criminal investigator training program, the inspector general investigator training program, as well as additional

1

training in financial crimes, money laundering, disability fraud, and social media and open source investigations.  I am assigned to investigate criminal, civil, and administrative violations, including, but not limited to wire fraud, bank fraud, money laundering, and false claims.  As an FRB OIG agent, I am authorized to investigate violations of United States law and am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.  Prior to my current position as a Special Agent with FRB OIG, I was employed as an investigative analyst for five years with the FRB OIG.  In that capacity, I assisted in numerous criminal investigations, involving bank fraud, disability fraud, false claims, and wire fraud.  I also served as the Inspector General Community representative to the Economic Crimes division of the U.S. National Central Bureau of the International Criminal Police Organization (INTERPOL Washington). While assigned to INTERPOL Washington, I provided assistance to numerous Inspector General criminal investigations.  I am a graduate of the State University of New York College at Oswego with a degree in political science and philosophy-psychology.

## FACTS SUPPORTING PROBABLE CAUSE

### A.   Background re: Rufrano and the Board's LTD Plan

5.     Rufrano is a former employee of the Board of Governors of the Federal Reserve (the "Board").  Rufrano left his employment at the Board in 2015 based upon a purported long-term disability.  Rufrano also received a medical retirement from the Board.  At the time, Rufrano was employed as a Senior Supervisory Financial Analyst.  Rufrano is also an attorney admitted to practice in New York.

6.     Rufrano told the Board that he was disabled in approximately July 2013.  Rufrano was diagnosed as suffering from agoraphobia with panic attacks, obsessive-compulsive disorder, and anxiety.  Rufrano originally filed for short-term disability ("STD"), and received STD benefits from approximately July 2013 until approximately January 2014.  Rufrano was later approved for the Federal Reserve System's long-term disability ("LTD") program.  Rufrano received LTD benefits from approximately January 2014 until approximately March 2019.

7.     The Federal Reserve System Office of Employee Benefits ("OEB") contracts with

2

a third party company, Matrix Absence Management ("Matrix") to administer its disability plans. The FRB OIG initiated this investigation after Matrix reported to the OEB that Rufrano was working and engaging in other activities in violation of the Board's long-term disability plan agreement. During a routine review, Matrix discovered that Rufrano had a significant internet presence indicating that he held outside employment. This was a violation of the rules relating to his participation in the long-term disability program, which state:

> Reporting Obligation. If an LTD Payee who has been determined to be Totally Disabled returns to work outside of a Rehabilitation Program, he is required to report this circumstance, no later than ten (10) days after the first day he returns to work outside of a Rehabilitation Program, to the Plan Administrator or its delegate. An LTD Payee is also required to report any income or wages earned for services provided outside of a Rehabilitation Program. If he fails or refuses to furnish such information, no further LTD Benefits shall be payable to the LTD Payee under the Plan.

8.      Had Rufrano told Matrix or the OEB of his outside activities and employment, his participation in the LTD program would have been terminated and he would have stopped receiving LTD benefit payments. The Board terminated Rufrano's benefits based on the information it received indicating that Rufrano had been engaging in outside employment in violation of the LTD plan terms.

**B.      Background re: Social Security Disability Insurance**

9.      On or about October 14, 2014, Rufrano filed for Social Security Disability Insurance ("SSDI") from the Social Security Administration (the "SSA"). On or about June 11, 2015, the SSA approved Rufrano's disability claim and authorized ongoing and retroactive benefit payments to Rufrano.

10.     SSDI beneficiaries, like Rufrano, have an obligation to tell the SSA when they start or stop working. If a beneficiary is working, he must also report any changes in his work duties, hours, or pay.

11.     As discussed below, Rufrano concealed his outside employment and continued to receive long-term disability payments from the Board and the SSA when he was not entitled to those payments. Rufrano engaged in, and received significant income from, outside employment

3

without reporting those activities to the Board or the SSA as required.

**C.**   **Rufrano's Medical Claims**

12.   Rufrano claimed that his condition was deteriorating throughout his time on

disability.  Rufrano claimed that he was forgetting names and details from conversations, that he

was unable to leave the house, or check his mail for weeks on end.

13.   For example, in an August 2014 letter, Rufrano's doctor stated that Rufrano was

sometimes

> unable to leave his house for several days because of the paralytic anxiety.  He
> frequently was even unable to go to his mailbox for week or open up his mail
> because of his anxiety.  He has developed a severe problem remembering
> people's names to the point where he was afraid to speak to relatives for fear of
> calling him by the wrong name . . . he was paralyzed in making even simple
> decisions and obsesses about things for weeks and months.

14.   In a March 2015 letter, Rufrano's doctor stated:

> Unfortunately during the past six months Mr. Rufrano's mental condition has
> slowly deteriorated so that at this point in time he is functioning like a patient who
> has early Alzheimer's Disorder. In view of his extremely poor cognitive function
> I cannot see Mr. Rufrano ability to hold any job even a fairly menial one,
> certainly not a high level job at the Federal Reserve board.

15.   In a March 2016 letter, Rufrano's doctor stated that "Mr. Rufrano does not have

the cognitive ability to engage in a full-time job. I have not seen improvement in his condition

over the last 12 months."

16.   After Matrix terminated his LTD benefits, Rufrano sent Matrix a letter from his

psychologist.  The letter is dated August 15, 2019 and reads in part:

> Mr. Lawrence Rufrano has been under my clinical care for two years. Mr.
> Rufrano's emotional wellbeing is at jeopardy after suffering strenuous
> work-related stress and traumas, in the past. This resulted in Generalized Anxiety
> Disorder (GAD -300.02), characterized by anxiety and worry that are difficult to
> control and interferes with day-to-day activities. Mr. Rufrano's GAD causes
> excessive avoidance around health issues, money issues, and work situations, to
> the extreme to neglect paying bills, collect and open mail for fear to be exposed to
> request for money, complaints, or critical issues, and retain employment.

**D.**   **Rufrano's Communications with Matrix and the OEB**

17.   Matrix had numerous contacts and communications with Rufrano. Rufrano would

often call and email Matrix staff about his disability claim and benefits.

18.     For example, Rufrano contacted Matrix via telephone in October 2015. According to notes taken by Matrix, Rufrano "asked if he can help someone with a project." The employee asked Rufrano whether he was going to be paid. Rufrano replied "no" but that he wanted to know if he could "have a little part-time job." According to the notes, the Matrix employee told Rufrano:

> [W]e explained that first we need him to email us in writing exactly what the project is and explain in detail the hours, tasks, etc. We also stated that if he is considering getting a part time job we would have to go to the OEB/BOG for approval, and we would need the job description, and each [month] before his LTD benefits are released we would need the prior months paystubs to confirm he did not earn greater than his pre-disability monthly wage. Plus because he is now earning SSD he would have to inform SSA as well.

19.     In May 2017, Rufrano emailed a Matrix employee a copy of his annual progress report. The progress report is a one-page document that was to be completed by Rufrano. In a section of the report titled "REGARDING YOUR DISABILITY," Rufrano was asked:

- Are you still unable to perform your usual work?
- Do you feel you could perform some occupation other than your usual?

Rufrano answered "Yes" to the first question and "No" to the second question.

20.     Another section of the progress report titled "REGARDING OTHER INCOME" asked Rufrano to answer whether he received various different types of income. Rufrano said that he was receiving income from "Social Security Disability – Primary" and from "Pension and/or Retirement Benefits." Rufrano said that he was not receiving "Employment Income" or "Other" types of income. Rufrano signed the progress report and dated it.

21.     Based on Rufrano's progress report, Matrix concluded that Rufrano "continue[d] to meet guidelines for ongoing LTD benefits under the FRS Plan." Matrix approved Rufrano for another year of disability benefits and continued to make Rufrano's payments.

22.     In May 2018, Matrix called and spoke to Rufrano for his annual review. Based on the progress report that Rufrano submitted, Matrix concluded that Rufrano "remains impaired from his diagnosis and [] has not received any new source of income." Matrix approved Rufrano for another year of disability benefits and continued to make Rufrano's payments.

23.     In March 22, 2019, Matrix sent Rufrano a letter saying that his LTD claim had been terminated effective March 1, 2019. Matrix had received information that Rufrano "possibly started employment[.]" The letter noted that Rufrano was entitled to a review of the decision and that he must submit a written appeal within ninety days.

24.     On March 25, 2019, Rufrano emailed Matrix ostensibly to request copies of his 2016 and 2017 W-2s.  The email stated in part:

> I would greatly appreciate it if you look at my medical records. You will find that I suffer from extremely severe OCD which prevents me from doing normal activities or maintaining full functionality. I cannot do normal things sometimes like return phone calls, open mail, or look at bank statements. My OCD often freezes me both mentally and physically. This problem is especially severe when it comes to my money.

25.     Rufrano submitted an appeal letter dated April 26, 2019 in response to the termination of his LTD benefits.

26.     In October 2019, Rufrano sent the OEB a letter from his doctor.[1] The letter stated in part:

> Unfortunately, asking Lawrence to write an explanation is nearly impossible for him due to the anxiety it creates for him. This request is equivalent to asking an unconscious person to become conscious or asking a person suffering from severe dementia to begin remembering facts and details.  This does not mean that he does not have a desire to write an explanation, he just does not have the capacity due to his anxiety at this time.
>
> In the near term, I will communicate on his behalf based upon what I have learned in our sessions together.  Lawrence did not have ability to communicate with Matrix, answer phone calls, open mail, read mail or insurance policies. He never looks at his checking account.
>
> . . .
>
> In the second half of 2018 and into 2019, I continued to work with Lawrence to determine if he had the ability to work a full time or in a job that required a consistent schedule of achieving goals of any kind on a regular basis.  Because of his inability to manage external stress, including his inability to respond to Matrix, and respond to daily demands, I have determined that Lawrence does not have the ability to work.  The severity of the constantly ruminating negative thoughts are still debilitating.

---

[1] Many of the letter's statements regarding Rufrano's work and volunteer history are inaccurate or incomplete.

27.     Over the next several months, Rufrano continued to communicate with Matrix and the OEB. Rufrano continued to argue over the final termination of his LTD and to highlight his claimed disabilities, even though he knew that his benefits terminated due to his outside employment.  Rufrano also continued to argue over the OEB's determination that he had received an overpayment of his LTD benefits.

**E.      Rufrano's Communications with the SSA**

28.     Rufrano completed an SSA Continuing Disability Review on July 17, 2019. According to a "report of contact" generated by the SSA, "Rufrano stated that in 2018 he was contacted by [UNIVERSITY 1] to assist with their fundraising.  He makes phone calls to potential donors . . . .  Each month he goes to [UNIVERSITY 1] and makes some phone calls to potential donors."  Rufrano did not disclose any additional work history information.

**F.      Rufrano's Concealed Employment**

**1.      COMPANY 1**

29.     Rufrano served as a member of COMPANY 1's Advisory Board.  An engagement letter signed by Rufrano and dated December 5, 2015 outlined the terms and conditions of Rufrano's participation as an advisor. The letter states in part:

> As a member of our advisory board, you may be asked to attend occasional
> face-to-face or teleconference meetings of our advisory board and to provide us
> such guidance with respect to our corporate, research and product development
> and marketing activities as we may request. As part of your participation you may
> be asked to assist, review our business strategies and product designs, guide our
> research, evaluate results and introduce us to potential partners and customers.

30.     Rufrano's term on the Advisory Board was for 2 years and Rufrano's service entitled him to purchase 20,000 shares of COMPANY 1's common stock.  On or about March 1, 2016 Rufrano received an option to purchase 191,500 shares in COMPANY 1.

31.     The FRB OIG interviewed COMPANY 1's CEO and General Counsel. According to the CEO, Rufrano mostly attended conferences and would contact COMPANY 1 if he met people that he thought COMPANY 1 personnel should speak with in order to further develop their products and engage as potential clients.

32.     The FRB OIG found a YouTube video titled "NABA April 8th Meet up –
Blockchain, game changer for supply chain" that was uploaded on April 13, 2017.  The
description accompanying the video identifies Rufrano as "Keynote 4: Lawrence Rufrano,
[COMPANY 1]."  Rufrano spoke for approximately 25 minutes and answered questions from
those in attendance.

   **2.     COMPANY 2**

33.     COMPANY 2 hired Rufrano as a member of its Executive in Residence ("EIR")
Program.  Rufrano signed an engagement document on or about December 13, 2016.  The
document also listed several membership commitments that Rufrano would have to fulfill, which
included:

- EIR Session: Minimum attendance of 2 EIR sessions per month (Friday mornings; subject to change)
- Startup Mentorship: Minimum mentorship of 1 [COMPANY 2] startup with needed, per month (8 hrs).
- Quarterly Report: To ensure a successful working relationship, you are expect to provide [COMPANY 2] a quarterly report detailing your activities with specific startups you have worked with during the month.

34.     On or about October 30, 2016, Rufrano sent an email to executives at
COMPANY 2.  It stated, in part:

> In summary, my hope is to develop relationship for [COMPANY 2] and its
> startups with agencies in Washington DC and to raise startups awareness of the
> boundaries of regulations.
>
> In my prior life on Wall Street, I advised numerous senior banking executives on
> capital raising, accounting and tax strategies. While at the Federal Reserve Board
> in Washington DC, my expertise in capital markets was drawn upon for educating
> the Board of Governors during and after the last financial crisis.  Hopefully I
> developed a sufficient set advisory skills and knowledge base that
> [COMPANY 2] will find useful.
>
> Currently, I am a visiting scholar at [UNIVERSITY 1] focused on bringing
> together technology, banking and regulatory policy under one teaching and
> research umbrella within the engineering school.
>
> It is been a real pleasure working with both of you.

35.     On or about November 17, 2016, Rufrano sent an email to a managing partner at
COMPANY 2.  It stated, in part:

I would welcome attending tomorrow's meeting.

One of my hopes over the last year has been to bridge some of the deep knowledge gaps between the heavy regulatory culture in Washington DC and the rapidly evolving technological development in Silicon Valley.  In particular, I don't want to see startups and technological hindered by slowly developed and poorly informed governmental policy decisions.  As a result, I have been working with [] and [UNIVERSITY 1] in convening conferences and forums to bring regulators, VC firms, startups and lawyers together. My background at the Federal Reserve and Wall Street lends to this.

. . .

I am currently a visiting scholar at [UNIVERSITY 1] and I am advising a number of startups.

### 3.   **LAW FIRM 1**

36.     LAW FIRM 1 hired Rufrano as a FinTech Advisor in October 2017.  Rufrano's

engagement letter, described the nature of his work as "non-legal services to the Firm and its

clients, as appropriate, regarding various technical, supervisory and policy issues and matters

involving the Firm's fintech and financial institutions advisory practices and related business

development initiatives[.]" Rufrano received a "flat monthly fee of US $18,750.00" for his work.

37.     On June 22, 2018, Rufrano sent LAW FIRM 1 a letter containing an invoice and

billing records for the period of October 28, 2017 through January 27, 2018.  The invoice read in

part:

Detailed Summary of business development activities October 28, 2017 – January 27, 2018

1. Expand relationship with [COMPANY 2], a Fintech incubator for start-ups based in Sunnyvale, CA.  Attended weekly meetings for approximately 4-5 hours to identify potential clients for [LAW FIRM 1]. Attended special Fintech events at [COMPANY 2] and hosted [redacted] and [redacted], introducing them to the event attendees.

2. Attempted to develop a Regtech incubator in Washington, DC with [COMPANY 2] acting as a partner. Conducted several phone calls and meetings with [COMPANY 2] to develop a strategy and business feasibility assessment. This did not move forward because [COMPANY 2] opted to open a New York office focused exclusively on Fintech.

. . .

4. Identified and established four new Fintech client relationships for [LAW FIRM 1] . . . .

5. Gave speeches at several major conferences . . . .

6. Established a relationship with [redacted] in order to obtain advisory work form the trust departments of major banks. Currently, a relationship is pending with [redacted] and a dialogue has been established with [redacted].

7. Arranged and conducted meetings with major European Banks . . . .

. . .

11. Established a partnership with [redacted] to host a Consumer Financial Services Roundtable on June 19, 2018 with [LAW FIRM 1].

. . .

13. Attended the European Economic Forum Innovation Roundtable in San Francisco and gave a talk on innovation and banking.

38.    Rufrano sent another letter on or about July 22, 2018 that included a timesheet for his activities from January 1, 2018 through July 2018.  The timesheet had approximately 105 entries, including the following:

January 31, 2018

Communications with [redacted], CEO of [redacted], re: working with [LAW FIRM 1] on acquisition of his company; contact with [redacted] re: potential projects and collaboration with [LAW FIRM 1]; further discussions re: meeting with Chief Data Officer for [redacted]; contact [redacted], Head of Innovation at [redacted] for a potential meeting; conduct work on [redacted] swaps and money transfer rules with [redacted] and [redacted]; calls with [redacted] and [redacted] re: speaking at a conference; [LAW FIRM 1] technology training session.

March 9, 2018

Call with [redacted], [redacted], and [redacted] staff to discuss [LAW FIRM 1's] ICO experience; discussions with [redacted] re: business strategy; call with [redacted] re: meetings with [redacted's] general counsel; call with [redacted] re: blockchain; lunch with [redacted] and [redacted]; call with [redacted] and [redacted].

April 3, 2018

Call with the marketing person for a meeting with [redacted]; Call with [redacted] re: lawsuit versus [redacted]; call with [redacted] re: term sheet for [redacted]; teleconference with [LAW FIRM 1], [redacted] and [redacted] founders re: [redacted] legality issues; Travel from NYC to Buffalo for [redacted] legal department meetings; meet with [redacted] legal department and [redacted]; debrief with [redacted] and [redacted] re: same; layover and return travel to San Francisco from Buffalo; call with [redacted] and commercial real estate lender.

May 2, 2018[2]

Organize Financial Services Roundtable (or CFS conference) / [redacted]; discussions with [redacted] re: [redacted] and next steps; call with [redacted] re: FSR Roundtable; email with [redacted] to schedule meeting to discuss blockchain and trusts; communications with [redacted] re: legal team contacts.

39.     According to the resume the he provided to [LAW FIRM 1], Rufrano served as a Board member for COMPANY 1 from "2015 through present", an "Executive in Residence" with COMPANY 2 from "2015 through present", and a "Visiting Scholar, Financial Technology" at UNIVERSITY 1 from "2015 through present."  Rufrano described his duties at COMPANY 2 as "Responsible for providing opinions on the viability of startup companies. Evaluate several hundred per year."

**4.     UNIVERSITY 1**

40.     Rufrano is the Executive Director of a financial technology laboratory at UNIVERSITY 1.  According to UNIVERSITY 1's website, Rufrano "focuses on deepening and expanding relationships with banks, investment firms and other financial institutions who are members or wish to become members of the [redacted].  In addition he provides a regulatory and business perspective for students and researchers in the [redacted] and its members."

41.     A second UNIVERSITY 1 webpage lists Rufrano as "Lecturer, Vice Provost for Teaching and Learning – Strategy Programs & Development."

42.     Rufrano's job description as executive director of UNIVERSITY 1's financial technology laboratory included the following:

The ED leads membership acquisition and sponsorship efforts for the Affiliate Program. This Work includes identifying, setting up and leading meetings with prospective affiliate member and working with the SoE development team on gifts and the Office of Industrial Contracts on how to document and invoice affiliate memberships.

The ED manages the Corporate Affiliates Program of the Lab.

---

[2] This is the day of Rufrano's 2018 annual review with Matrix, discussed above.

The ED is the primary liaison for affiliates [delete: donors] (*sic*) and visiting scholars sent by affiliates.

The ED organizes and seeks corporate sponsorships for Lab events, including the annual AI in Fintech event.

The ED represents the Lab to internal and external parties.

The ED creates and directs marketing efforts for the Lab, including member website, newsletter, etc.

43.     I interviewed Rufrano's supervisor at UNIVERSITY 1.  The supervisor explained that Rufrano initially approached UNIVERSITY 1 about a potential project with an external donor, but that research project never materialized.  The supervisor explained that this process lasted several months and involved emails, in person meetings, and calls with Rufrano.  Rufrano subsequently brought in additional sponsors.

44.     The supervisor confirmed that UNIVERSITY 1 renewed Rufrano's position several times based on his performance.  The supervisor said that Rufrano meets expectations and has no issues.

45.     As part of his job at UNIVERSITY 1, Rufrano speaks with donors, attends monthly meetings, and identifies and speaks with sponsors and speakers.  Rufrano also participates in executive education sessions where he speaks with 10 to 30 people at a time and makes speaker introductions at an annual conference with 300 to 400 people in attendance.

### 5.     LAW FIRM 2

46.     Rufrano joined LAW FIRM 2 in or about June 2019.  LAW FIRM 2 hired Rufrano as a part-time employee with the title of "Sr. Business Development Advisor."  Rufrano received an annual salary of $175,000.

47.     In April 2019, Rufrano sent an email with his resume to the Assistant Director of Practice Development at LAW FIRM 2.  The email read in part:

Please find my resume.

Note that the last full time job was with the Federal Reserve.  My job with [LAW FIRM 1] was on a contract basis from October 2017 to April 2019.

[UNIVERSITY 1] is a part time position.

[COMPANY 1] was an unpaid advisor position for stock options.

[COMPANY 2] is an unpaid position.  However, I get to see up to 700 startups a year that could be potential clients.

The United Nations is an advisory committee position and unpaid.  It is for the experience.

***Essentially, I tried retiring and found life too boring.***  There are numerous older advisors to the tech industry who get paid in stock options.  (emphasis added)

## 6.  **COMPANY 3**

48.     COMPANY 3's founder is Rufrano's supervisor at UNIVERSITY 1.  Rufrano signed a consulting agreement with COMPANY 3 in or about June 2018.  The agreement contains a statement of work outlining the services Rufrano agreed to perform.  It reads in part:

The Services to be performed by Consultant ("Services") generally are as follows:

1.  Business development, in particular in relation to engagements with [redacted].

. . .

3.  Assistance with the development of strategies to meet compliance requirements of the Company's clients.

4.  Serving as the Company's compliance officer for the term of a client engagement.

49.     During his interview, COMPANY 3's founder explained that he and Rufrano could not agree on how to make payments for Rufrano's work with COMPANY 3.  He said that Rufrano wanted to hold off on receiving a $15,000 payment until a later date, purportedly because of his taxes.   Rufrano eventually submitted a $9,000 invoice, dated December 4, 2019, for "Services Rendered for [redacted]."

## 7.   **Rufrano Fintech Technology, LLC**

50.     Rufrano Fintech Technology, LLC organized in or about May 2018 by filing Articles of Organization and a Certificate of Organization in Virginia.

51.     Rufrano opened a bank account for Rufrano Fintech Technology, LLC in or about June 2018.  According to the business bank account application, the company had $50,000 in sales in 2017 and provided legal consulting for finance and banking technology.  The application

listed Rufrano as Rufrano Fintech Technology, LLC's controlling owner.

**G.**   **Interstate Wire**

52.   Rufrano received a $1,936.99 LTD benefit payment from Matrix on or about May 31, 2018.

53.   Matrix communicated with Rufrano and processed his claims from their Phoenix, AZ office.  There, Matrix employees entered Rufrano's claim and payment information into a system called the Policy Administration and Claims System ("PACS").  A separate firm located in Philadelphia, PA runs PACS.  When that firm received payment information from Matrix, it transmitted payment instructions via electronic message to a Matrix-managed bank account at U.S. Bank.  According to Matrix, that bank account was opened in, and managed from, Minneapolis, MN.  Based on these electronic messages, ACH[3] payments were initiated from the Matrix-managed account at U.S. Bank to Rufrano's personal bank account at Wells Fargo.  In May 2018, the address associated with Rufrano's Wells Fargo account was a post office box in San Francisco, CA.

//

//

//

//

//

//

//

//

//

---

[3] The ACH system is a batch-oriented interstate funds transfer network through which depository institutions send each other batches of electronic credit and debit transfers. Payroll direct deposits and Social Security benefit payments are typical examples of ACH credit transfers.

## **CONCLUSION**

54.     Based on the information above, there is probable cause to believe that Lawrence Rufrano committed wire fraud, in violation of Title 18, United States Code, Section 1343, on or about May 31, 2018 in the Northern District of California.  Therefore, I respectfully request that the Court issue the proposed criminal complaint, arrest warrant, and summons.


___/s/ Alan Hershkowitz_____
**ALAN HERSHKOWITZ**
Special Agent
Federal Reserve Board, Office of Inspector General


Subscribed and sworn to me by telephone on this __21__ day of October 2020.


HONORABLE SALLIE KIM
United States Magistrate Judge

15